**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| RICHARD ALEXANDER, EVELYN ALEXANDER, BRENDA TURNER, SHAWN FISCHER, TROY STONE, AND SHERA STONE, individually, and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br>v.<br><br>FCA US LLC f/k/a CHRYSLER GROUP LLC and LEAR CORPORATION,<br><br>*Defendants*. | Civil Action No. 3:26-cv-00314<br><br>Judge Brantley Starr |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Richard Alexander, Evelyn Alexander, Brenda Turner, Shawn Fischer, Troy Stone, and Shera Stone ("Plaintiffs") bring this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") against Defendants FCA US LLC f/k/a Chrysler Group LLC ("FCA") and Lear Corporation ("Lear") (together "Defendants") and allege as follows:

## I. NATURE OF THE ACTION

1. Motor vehicles are a fixture of modern life in the United States. Every day, millions of Americans drive automobiles. They drive their children to school, they drive themselves to work, they drive to purchase essentials like food and medicine, and they sometimes drive just to enjoy a sunny day. For most Americans, the purchase or lease of a motor vehicle is their second largest financial investment, following only the purchase or lease of a home.

2. While cars are a common feature of our daily lives, they are also potentially dangerous – car crashes in the U.S kill or injure millions of people every year, at a total injury cost

of +$500 billion. This case arises out of one of those dangers in the "Class Vehicles."

3. "Class Vehicles" or "Vehicles" are the following vehicle models with a driver and/or front passenger seat equipped with an electric seat height adjuster (the "Seat"):[1]

a. 2011-2023 Dodge Charger (LD);

b. 2011-2023 Chrysler 300 (LX);

c. 2011-2023 Dodge Challenger (LC/LA);

d. 2011-2017 Chrysler 200 (UF); and

e. 2013-2016 Dodge Dart (PF).

4. FCA designed and manufactured the Class Vehicles and introduced the first one in Model Year 2011. Lear designed the Seats in the Class Vehicles.[2] Hidden within the Seat is a defective and dangerous component: the electric seat height adjuster (the "Defective Seat Height Adjuster" or "Defect")). The motor, gear box, and lead screw of the Defective Seat Height Adjuster were manufactured and supplied as a single unit by Keyang Electric Machinery Co., Ltd. ("Keyang") according to Lear's specifications.

5. The Defective Seat Height Adjuster collapses in virtually every rear-impact collision at speeds as low as 25 MPH. In its most pernicious manifestation, the Seat drops out from under the occupant and suspends the occupant in space,[3] out of position relative to the Seat carriage, Seatback, lap belt, upper torso restraint, head restraint, airbags, and other impact safety features of the Class Vehicles – the higher the Seat is adjusted, the greater the risk of injury or death:

---

[1] Some of what would otherwise be Class Vehicles were equipped with a manual (vs. electric) seat height adjuster. Seats with driver's side manual seat height adjusters are not "Class Vehicles."
[2] FCA and Lear together designed the Seat Height Adjuster.
[3] Class Vehicles were not equipped with a pretensioner. A pretensioner is a mechanism that tightens the lap belt and anchors the occupant's pelvis to the Seat carriage in a collision.



6. The Defect is inherently undiscoverable. The Defective Seat Height Adjuster is riveted into underside of the Seat carriage, out of sight, and the Defect is only discoverable when the Defective Seat Height Adjuster fails in a rear-impact collision. Both FCA and Lear knew of the Defect when Lear agreed to manufacture the Seat for FCA and install it in Class Vehicles.

7. Plaintiffs bring this action to obtain redress for themselves and each Class Member who purchased or leased a Class Vehicle in the United States. Plaintiffs and the Class seek (1) remedies for Defendants' RICO violations, violations of consumer protection statutes, breach of express warranties, breach of implied warranties, fraud, and unjust enrichment and (2) declaratory and injunctive relief to prevent Defendants' continued misconduct.

## II. PARTIES

### A. Plaintiffs

### 1. Richard Alexander and Evelyn Alexander

8. Plaintiffs Richard and Evelyn Alexander (the "Alexanders") reside in Desoto,

Texas. In February 2014, the Alexanders purchased a new 2014 Chrysler 300 (VIN#: 2C3CCAAG7EH200659) from Chrysler Dallas Dodge (now Clay Cooley Dallas Chrysler Jeep Dodge Ram) located at 11550 Lyndon B Johnson Fwy, Dallas, Texas 75238.

9. At the time the Alexanders acquired their Class Vehicle, they had a reasonable expectation that it was equipped with a reasonably safe Seat and Seat Height Adjuster. The Alexanders did not know and could not know through the exercise of reasonable diligence that their Class Vehicle was equipped with the Defective Seat Height Adjuster.

10. Before purchasing their Vehicle, the Alexanders compared their Class Vehicle to other similar vehicles. The Alexanders saw no representations from Defendants that the Vehicle contained a defect that would result in the dangerous failure of the Defective Seat Height Adjuster.

11. FCA and Lear concealed the existence of the Defective Seat Height Adjuster from consumers like the Alexanders, and this concealed information would have been material to the Alexanders in their decision to acquire the Class Vehicle.

12. Had Defendants disclosed to the Alexanders that the Class Vehicle they purchased was equipped with the Defective Seat Height Adjuster, whether on FCA or Lear's websites, through FCA's dealership, in their warranty manual, or elsewhere prior to the Alexanders purchasing their Vehicle, the Alexanders would not have made the purchase or would have paid less for the Vehicle. As a result, the Alexanders received less than they paid for their Vehicle and did not receive the benefit of their bargain.

**2. Brenda and Christian Turner**

13. Plaintiff Brenda Turner and Christian Turner (the "Turners") reside in Desoto, Texas. On March 9, 2022, Turners purchased a new 2021 Dodge Challenger (VIN#: 2C3CDZFJ6MH623974) that she purchased from Clay Cooley Dallas Chrysler Jeep Dodge Ram

located at 11550 Lyndon B. Johnson Fwy., Dallas, Texas 75238.

14. At the time the Turners acquired their Class Vehicle, they had a reasonable expectation that it was equipped with a reasonably safe Seat and Seat Height Adjuster. The Turners did not know and could not know through the exercise of reasonable diligence that their Class Vehicle was equipped with the Defective Seat Height Adjuster.

15. Before purchasing their Vehicle, the Turners compared their Class Vehicle to other similar vehicles. The Turners saw no representations from Defendants that the Vehicle contained a defect that would result in the dangerous failure of the Defective Seat Height Adjuster.

16. FCA and Lear concealed the existence of the Defective Seat Height Adjuster from consumers like the Turners, and this concealed information would have been material to the Turners in their decision to acquire the Class Vehicle.

17. Had Defendants disclosed to the Turners that the Class Vehicle they purchased was equipped with the Defective Seat Height Adjuster, whether on FCA or Lear's websites, through FCA's dealership, in their warranty manual, or elsewhere prior to the Turners purchasing their Vehicle, the Turners would not have made the purchase or would have paid less for the Vehicle. As a result, the Turners received less than they paid for their Vehicle and did not receive the benefit of their bargain.

18. Since discovering that her Class Vehicle contains the Defective Seat Height Adjuster, Brenda Turner refuses to drive it due to the elevated risk of injury presented by her adjusted Seat position of "full-up."

**3. Shawn Fischer**

19. Plaintiff Shawn Fischer ("Mr. Fischer") resides in Rowlett, Texas. In the Spring 2020, Mr. Fischer purchased a used 2015 Dodge Charger (VIN#: 2C3CDXH6FH890041) from

Freedom Chrysler Dodge Jeep Ram Fiat by Ed Morse located at 2516 University Blvd., Durant, Oklahoma, 74701.

20. At the time Mr. Fischer acquired his Class Vehicle, he had a reasonable expectation that it was equipped with a reasonably safe Seat and Seat Height Adjuster. Mr. Fischer did not know and could not know through the exercise of reasonable diligence that his Class Vehicle was equipped with the defective Seat Height Adjuster.

21. Before purchasing his Vehicle, Mr. Fischer compared his Class Vehicle to other similar vehicles. Mr. Fischer saw no representations from Defendants that the Vehicle contained a defect that would result in the dangerous failure of the Defective Seat Height Adjuster.

22. FCA and Lear concealed the existence of the Defective Seat Height Adjuster from consumers like Mr. Fischer, and this concealed information would have been material to Mr. Fischer in his decision to acquire the Class Vehicle.

23. Had Defendants disclosed to Mr. Fischer that the Class Vehicle he purchased was equipped with the Defective Seat Height Adjuster, whether on FCA or Lear's websites, through FCA's dealership, in their warranty manual, or elsewhere prior to Mr. Fischer purchasing his Vehicle, Mr. Fischer would not have made the purchase or would have paid less for the Vehicle. As a result, Mr. Fischer received less than he paid for his Vehicle and did not receive the benefit of their bargain.

**4. Troy and Shera Stone**

24. Plaintiffs Troy and Shera Stone (the "Stones") reside in Princeton, Texas. On May 28, 2022, the Stones purchased a used 2019 Dodge Challenger SRT (VIN#: 2C3CDZL90KH503045) from Clay Cooley Chevrolet of Dallas f/k/a Young Chevrolet located at 9301 E R.L. Thornton Fwy., Dallas, Texas 75228

25. At the time the Stones acquired their Class Vehicle, they had a reasonable expectation that it was equipped with a reasonably safe Seat and Seat Height Adjuster. The Stones did not know and could not know through the exercise of reasonable diligence that their Class Vehicle was equipped with the Defective Seat Height Adjuster.

26. Before purchasing their Vehicle, the Stones compared their Class Vehicle to other similar vehicles. The Stones saw no representations from Defendants that the Vehicle contained a defect that would result in the dangerous failure of the Defective Seat Height Adjuster.

27. FCA and Lear concealed the existence of the Defective Seat Height Adjuster from consumers like the Stones, and this concealed information would have been material to the Stones in their decision to acquire the Class Vehicle.

28. Had Defendants disclosed to the Stones that the Class Vehicle they purchased was equipped with the Defective Seat Height Adjuster, whether on FCA or Lear's websites, through FCA's dealership, in their warranty manual, or elsewhere prior to the Stones purchasing their Vehicle, the Stones would not have made the purchase or would have paid less for the Vehicle. As a result, the Stones received less than they paid for their Vehicle and did not receive the benefit of their bargain.

**B. Defendants**

**1. FCA US LLC**

29. FCA is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan. Defendant FCA US LLC designed, manufactured, marketed, distributed, leased, and sold, through its authorized dealers, distributors, and other agents, the Class Vehicles to Plaintiffs and Class Members. FCA US LLC has been served and has appeared.

30. FCA's authorized dealers are agents of FCA: (1) FCA issues Technical Service

Bulletins to its dealerships relating to common defect, maintenance, and service issues in FCA vehicles; (2) FCA warranty directs Class Vehicle owners to present their vehicles to FCA' authorized dealerships for repairs; and (3) FCA requires dealerships to submit detailed data to it regarding repairs performed at dealerships.

31. FCA is one of the largest companies in the global automotive industry. Stellantis, the parent company of brands like Chrysler, Jeep, and Dodge, sold 6,392,600 vehicles globally in 2023 for a total revenue of $204 billion.

**2. Lear Corporation**

32. Defendant Lear is a Delaware corporation with its principal place of business in Michigan. Lear has been served and has appeared.

33. Lear and FCA designed the Seat Height Adjuster and Lear designed, tested, and manufactured the Seat for Class Vehicles sold by FCA.

## III. NON-PARTIES

34. FCA's authorized dealers operate under a franchise agreement with FCA. The franchise agreement grants the authorized dealers the authority to sell and service FCA vehicles, but the authorized dealers retain significant autonomy in their business operations. Under the franchise agreement, the authorized dealers manage their own sales, local marketing and advertising, customer service (including service and parts), financial operations (including inventory, financing, and other business expenses), and employees (hiring, training, and managing their staff). As a conduit for customer feedback, the authorized dealers also influence product configurations, service programs, and warranties. These dealerships also act as a conduit for information circulated by to purchasers of FCA's vehicles.

35. FCA and Lear use several marketing companies or advertising agencies to promote

the sale of Class Vehicles. For example, GSD&M and Omni Advertising lead FCA's mainstream advertising and creative campaigns. Omni Advertising specializes in marketing FCA dealerships and builds programming and experiences to showcase FCA vehicles. Moncur handles Lear's automotive marketing efforts.

## IV. JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one member of the class of plaintiffs and one defendant are citizens of different States.

37. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have claims under 18 U.S.C. § 1964 (RICO) and supplemental jurisdiction over the alleged state law claims pursuant to 28 U.S.C. § 1367.

38. This Court has specific personal jurisdiction over FCA and Lear because they conduct business in Texas, have purposefully availed themselves of the benefits and protections of Texas by continuously and systematically conducting substantial business in this judicial district, directing advertising and marketing materials to districts within Texas, and intentionally and purposefully placing Class Vehicles into the stream of commerce within the districts of Texas and throughout the United States with the intent that consumers would purchase them in the districts to which they were shipped. Thousands of Class Vehicles have been sold in Texas and are operated within the State and this judicial district.

39. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district,

because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district or a substantial part of property that is the subject of the action is situated in this district. Additionally, venue is proper under 28 U.S.C. § 1965(b) because in any action brought under the Federal RICO statute in a U.S. District Court, the court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it. Here, the ends of justice require this Court's exercise of personal jurisdiction over all Defendants. Along with the acts alleged in this Complaint, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce and the United States mail. Defendants operated an enterprise within the meaning of 18 U.S.C. §1961(4) that operates in interstate commerce and the activities of which affect interstate commerce.

## V. GENERAL FACTUAL ALLEGATIONS

40. This action is brought against FCA and Lear on behalf of Plaintiff and a Nationwide Class who purchased or leased a Class Vehicle. The dangerous Defect in the Defective Seat Height Adjuster was known by Lear when it manufactured and sold the Seat to FCA, and by FCA when it manufactured and sold the Class Vehicles. The answer to the question "how could this happen in this day and age" is informed by an understanding of the subordination of good judgment to economic expediency.

### A. Chrysler's 2007-2021 Sojourn

41. In 1998, Chrysler and its subsidiaries entered into a partnership dubbed a "merger of equals" with German-based Daimler-Benz AG, creating the combined entity DaimlerChrysler AG ("DaimlerChrysler"). By 2001, Chrysler was losing $3 billion annually and key competitors had crushed its U.S. market share by nearly 40 percent, with brand and channel conflicts resulting in few cross-selling results. After nine years of management agony and billions of dollars in losses

Daimler had had enough and, in May 2007, sold 80.1% of its interest in Chrysler to Daimler Cerberus Capital Management ("Cerberus") for $7.4 billion Daimler retained a 19.9% stake and later changed its name to Daimler AG.[4] For the first time in history, a major U.S. automaker was entirely in the hands of a private equity group. The decline in Chrysler's reliability and safety standards began at precisely the same time as the development of the Seat and the Class Vehicles.

42. After Cerberus acquired Chrysler, things went from bad to worse. Chrysler's sales collapsed, credit markets were frozen, Cerberus refused to further capitalize Chrysler, and the company was surviving on emergency government loans. Unlike its Detroit rivals, Chrysler lacked competitive compact and subcompact vehicles at a time when consumers were shifting away from large trucks and SUVs.

43. On January 20, 2009, Italian automaker Fiat and the struggling Chrysler announced a nonbinding global alliance. The agreement gave Fiat an initial 35% stake in Chrysler in exchange for access to Fiat's small-car technology, fuel-efficient engines, and European distribution network — resources Chrysler desperately needed to survive.

44. The alliance was subject to additional government assistance and a broad restructuring of Chrysler's debt, labor contracts, and dealer network. Within months Chrysler entered a brief, government-supervised bankruptcy, to shed liabilities and complete the partnership. When it emerged that summer, Fiat formally took control of management operations.

45. Fiat initially purchased a 20% stake in Chrysler in 2009, which grew to 58.5% by January 2012. The gradual takeover concluded in January 2014 with a $4.9 billion payment plus $5.5 billion in pension liability assumptions.

[4] Chrysler was the single largest investment Cerberus had ever made, about 7.5% of its assets under management.

46. In January 2014, Fiat Group acquired 100% ownership of Chrysler Group, paving the way to complete the union between the two groups. The merger of the Italian and American companies created a multinational organization operating in more than 140 countries and employing nearly 236,000 people. The merger formally became effective on October 12, 2014, with FCA becoming the holding company for the Fiat Chrysler Group.

47. FCA itself later merged with PSA Group (Peugeot/Citroën) in 2021.

**B. Lear and FCA Agree on the Safety Performance Criteria for the Seat Height Adjuster**

48. The Seat Height Adjuster is comprised of a Motor, Gear box, Lead Screw (threaded shaft), a Nut that moves along the shaft as it rotates, and a Bracket welded to the nut. The Motor is mounted to the seat frame, and the Bracket is riveted to Seat. The right side of the Bracket is approximately the width, length, and thickness of a stick of Double Mint gum:




49. The motor is activated by a switch mounted on the outside of the Seat. If the occupant presses ***down*** on the switch, the screw turns clockwise and moves the nut and attached

bracket ***closer*** to the motor, thereby moving the Seat downwards.

50. If the occupant pulls the switch ***up***, the screw turns counterclockwise and moves the nut and attached bracket ***farther*** away from the motor, thereby moving the Seat upwards.

51. The Seat and its components, including the Defective Seat Height Adjuster, was designed,[5] developed, and manufactured by Lear pursuant to FCA's Outside Design and Development ("ODD") process. Under the ODD process, Lear agreed to design, development, manufacture, and test the Seat in compliance with, *inter alia*, FCA's DC-10859 (Front Seat Common Structure), FCA US's internal standard for Dynamic Rear Impact ("DC-10859"). DC-10859 required that in specific rear-impact sled testing:

a. the seat must remain in locked position;

b. with no structural failure, splinters, or sharp edges;

c. the torso of the ATD's must not bypass the seat back; and

d. that permanent deformation of seat back must not exceed 27° from initial position.

52. During Lear's testing of various iterations of the Seat, the Seat was tested in the full-up (Defective Seat Height Adjuster fully extended), mid (Defective Seat Height Adjuster extended half-way), and full-down position (Defective Seat Height Adjuster fully retracted).

53. Lear discovered in its early rear-impact sled testing that the Seat "did not meet [DC-10859] Criteria" due to the "Height adjusters [failing] to maintain pre-test position (bracket deformation)." As revealed in the following excerpts of a Lear test report, rather than switching to structural or hardened steel, increasing the grade/tensile strength of the screw, or using a screw

[5] The motor part of the Seat Height Adjuster was manufactured by Keyang Electric Co, Ltd. and its "Rear Vertical Bracket" was manufactured at a plant owned and operated by a Mexican subsidiary of Lear that also assembled the subassembly.

with a larger diameter, FCA and Lear agreed to weaken the Bracket so profoundly that it would fail at a speed lower than that required to break the Lead Screw.[6] According to a Lear Test Report related to the fracturing Lead Screw:

a. Safety performance requirement:

> Seat must remain in locked position with no structural break, splinters or sharp edges

b. Seat failed:

> Height adjusters did not maintain pre-test position (bracket deformation)

c. Test Incident:

> Height adjuster lead screw fractured. (spec- seat must maintain pretest position)

d. FCA agrees to abandon the safety requirement:

> Customer Deviation Customer has accepted performance deviation.

e. FCA and Lear agree to eliminate the risk of Lead Screw failure by weakening the Bracket to collapse:

> Corrective Action As an interim fix, we modified the bracket by machining the flanges to allow for some bending and this helps keep the leadscrew in alignment and without total fracture. Reference Test # 278-05-10-hg. We are still investigating final design of the bracket for production purposes.

54. The following photograph shows the Defective Seat Height Adjuster Bracket, which is painted green, just before a rear-impact sled test at 25 MPH. The silver component to

---

[6] Assume that "X" = the force required to break the Lead Screw. To eliminate the risk that the Lead Screw would break, the Bracket had to failed at a force of X-1.

which the Bracket is attached rotates on the yellow pivot point to raise or lower the seat as the Bracker is extended or shortened as the Nut moves along the Lead Screw:



55. This is a photograph of the failed Defective Seat Height Adjuster after the test:



56. Rear-impact sled testing of the Seat equipped with the weakened Bracket confirmed what FCA and Lear already knew – that the  Bracket collapses, significantly increasing the risk of injury or death to occupants of the Seat, so much so that Lear found it necessary to strap the feet of its test dummies to the floor of the test assembly to avoid damaging the dummies  in rear-impact sled testing.

57. Despite their knowledge that of the danger of the Defect, on or about February 11, 2011, FCA and Lear agreed that the Seat would be manufactured and installed in the Class Vehicles ***without*** correcting the Defect. They did so with full knowledge that the Seat was so dangerous in rear-impact sled testing that its test dummies' feet had to be strapped to the floor to avoid extensive damage to the dummies.

58. Upon information and belief, FCA and Lear approved the Design Verification Plan & Report ("DVP&R")[7] for all Class Vehicles acknowledging that Class Vehicle seats "did not meet requirements" of the rear impact testing requirements because the "height adjuster did not maintain pre-test position due to the deformation of the lift bracket."

59. On or about February 17, 2011, Lear provided FCA with the DVP&R for the Dodge Charger and Chrysler 300. This DVP&R:

a. confirmed that in various testing the Defective Seat Height Adjuster failed to meet the requirement that the Seat maintain its pre-test position:

| | | |
|---|---|---|
| Met Requirements | Ref TR 229-11-10-hq 5th | |
| Did not meet Requirements | Ref TR 158-11-10-hq 95th<br>IB deflection was 28 deg | → EJ OK |
| Met Requirements | Ref TR 483-11-10-hq 50th | |
| Did not meet Requirements | Ref TR 160-11-10-hq 5th<br>Height adjuster did not maintain pre-test position due to deformation of lift bracket<br>6-way structure validated on this test. Back panel validated on 8-way structure. | → OK breakage -no |
| Did not Meet Requirements | Ref TR 005-11-10-hg 5th<br>Height adjuster did not maintain pre-test position due to deformation of lift bracket | → ok no breakage |
| Met Requirements | Ref TR 006-11-10-hq 50th | |
| Did not meet Requirements | Ref TR 007-11-10-hq 5th<br>IB def 29 deg, OB def 32 deg | → EJ OK |

b. and that FCA engineer Matthew Kaye "ok'd" the failed Defective Seat Height Adjuster for installation in the Seat:

| | |
|---|---|
| DVP NUMBER: LXLDSRTBRW1POR | DEPT: |
| PLAN DATE: 3/12/2009 | PLAN ORIGINATOR: R. Mohr |
| CONCURRENCE: M.Kaye | MANAGER APPV'L: J. Ventimiglio |
| REVISION DATE: 2/17/2011<br>PRINT DATE: 3/3/2011 | REPORTING ENGR: R. Mohr / D.Sweeting |

60. The same Defective Seat Height Adjuster was installed in the Seat installed in the Dodge Dart, Chrysler 200, and Dodge Challenger Class Vehicles, fails in exactly the same way,

[7] A "DVP&R is widely used in the automotive industry to plan, track, and report the testing and validation of a product or component.

and was installed in every year model of every Class Vehicle. Given these facts, upon information and belief, every DVP&R that received final approval sign off for all Class Vehicles also had Seats in which Seat did not "maintain pre-test position" because the Defective Seat Height Adjuster "did not maintain pre-test position due to the deformation of the lift bracket."

61. FCA and Lear also knew that an occupant out of position relative to the other elements of the impact safety system would exponentially increase the risk of head injury in a rear-impact collision.

### C. The Federal Motor Vehicle Safety Standards ("FMSS") do not Govern the Defect/Product Risks Alleged

62. Congress created the National Highway Traffic Safety Administration ("NHTSA") in 1970 and charged it with promulgating Federal Motor Vehicle Safety Standards ("FMVSS") for new motor vehicles and motor vehicle equipment. Although the Defective Seat Height Adjuster is not subject to an FMVSS performance requirement, FCA and Lear failed to disclose the danger of the Defective Seat Height Adjuster to the Class, and actively decided not address it.

63. A motor vehicle (FCA) or motor vehicle equipment manufacturer (Lear) that "(1) learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety ***or*** (2) decides in good faith that the vehicle or equipment does not comply with an applicable [FMVSS]," must notify "the owners, purchasers, and dealers of the vehicle or equipment." 49 U.S.C. § 30118(c) (emphasis added).

64. "'Motor Vehicle Safety' means the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident and includes nonoperational safety of a motor vehicle." 49 U.S.C. § 30102(a)(9). This definition, and the use of "or" between subsections (1) and (2) of 49

U.S.C. § 30118(c) above, make it clear that a "defect" required to be disclosed to vehicles owners is ***not*** limited to those that might constitute a violation of a specific FMVSS performance standard – the test is whether the defect is related to "Motor Vehicle Safety." This is in accord with NHTSA's view of what a manufacturer must do in discharging the duty of "good faith."

> A manufacturer cannot evade its statutory obligations "by the expedient of declining * * * to reach its own conclusion as to the relationship between a ***defect in its vehicles and*** * * * ***safety***." *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). Thus, a manufacturer incurs its duties to notify and remedy whether it actually determined, or it should have determined, that its vehicles are defective and the defect is safety-related. The failure to perform these duties in a timely manner is a violation of the Safety Act that can subject the manufacturer to substantial civil penalties. *See* 49 U.S.C. 30165.[8]

65. Although Lear conducted FMVSS 207 (Seating Systems) compliance testing of the Seat,[9] FMVSS 207 does not govern or provide performance requirements for seat height adjusters. Indeed, it was not until July 16, 2024, that NHTSA first issued an Advance Notice of Proposed Rulemaking ("NPRM") requesting public comment on establishing such requirements;

> [Petitioner] also suggested that NHTSA impose a requirement so that, when tested to failure, there is no sudden drop in load of 1,780 N (400 lb-£) or greater within a short span. NHTSA is also granting the petition on this issue in part. NHTSA is aware of others who have recommended similar changes in the past to assure a gradual deformation of seat back components. NHTSA notes that [Petitioner] did not suggest an objective and practicable test

---

[8] 69 Fed. Reg. 49,821 (Aug. 12, 2004), *Motor Vehicle Safety; Reimbursement Prior to Recall* (emphasis added).

[9] FMVSS 207 is a relic from a 1950s-era seat strength recommendation of the Society of Automotive Engineers ("SAE"). Cardboard chairs and lawn chairs have been tested to FMVSS 207 specifications – and passed. Even Lear and FCA recognize that FMVSS 207 has no real world applicability. Upon information and belief, one or more of Compliance Reports, *FCA's Seat Anchorage Strength (Inertia & Occupant Loading) and Seat Latch Performance (Static Loading & Acceleration)* for the 2014 Dodge Charge and Chrysler 300 Class Vehicles failed to demonstrate compliance of the Seat with specific testing required by FMVSS 207. This may, however, been an innocent documentation error on the part of FCA.

> procedure. Depending on how a test is carried out, a sudden load drop in a quasi-static test may not necessarily indicate an unsafe design. Even a drop to zero is not necessarily problematic if a slight perturbation in backward movement brings the load back up. NHTSA seeks comment on this requirement. What safety benefits could be obtained from such a requirement? Is there a practicable and objective test procedure that can be developed?[10]

66. On September 16, 2024, the Alliance for Automotive Innovation (the "AAI") , the members of which includes FCA's parent, Stellantis NV, submitted its comments to the NPRM. Ironically, even this automotive trade group recommended to NHTSA that it promulgate a safety standard that required "no loss of a locking position" in rear-impact collisions based on defined deflection criteria – the very standard abandoned by FCA and Lear:

> We do not agree with the agency's assessment that a drop in load indicates an unsafe design. Seating systems typically include design elements built with the intent to absorb high energy loads in dynamic events, and twisting of the back rest may be expected. When tested statically, the deformation is not linear. Therefore, drops in load may occur, and in some cases may be an intended design response. **In place of a requirement to measure for drop in load, we propose the agency consider a requirement for no loss of a locking position** based on a defined deflection criteria. If a load drop of 1780N (400lb-f) or more is required within a short span, additional supporting data must be provided to justify the proposal beyond the analysis provided in the ANPRM and related petition. The research should also inform other test parameters, including test load reach time, load holding time, ATD seating position.

(Emphasis added).

**D. FCA and Lear's Knowledge of the Risk**

67. Despite the fact the FMVSS standards do not apply to this risk, FCA's knowledge that the Seat did not remain in the pre-test position after rear impact testing in violation of its own safety requirement, and Lear's practice of strapping test dummies' feet to the floor of rear-impact

[10] 89 Fed. Reg. 58,022 (July 16, 2004), *Seating System.*

sled test assemblies to avoid damage to the dummies, demonstrate that FCA and Lear knew, or should have known, that Seat would present a grave risk of injury or death to the Class Members and their passengers. Afterall, Class members and their passengers were not offered by FCA or Lear the added protection of strapping their feet to the floor. Public filings underscore FCA's direct knowledge of the risks posed by the Defect.

68. In 1997, Daimler/Chrysler was granted a U.S. patent for an invention consisting of an "Arrangement for Adjusting the Sitting Position of a Vehicle Occupant." According to the patent:

> For minimizing the danger of injury to the vehicle occupant, it is necessary in the case of certain Seat components to prevent the vehicle occupant from carrying out the adjustment and implementing the adjustment automatically. **This applies particularly to the adjustment of the headrest since only its precise adjustment ensures satisfactory support of the head in an accident, thus providing sufficient protection.**

(Emphasis added). FCA knew the risks faced by an out-of-position occupant.

69. Similarly, in 2008, Daimler/Chrysler applied for a U.S. patent for a seat height adjuster that would not fail or deform in a collision. According to the Application:

> During an accident, due to the abrupt deceleration, high inertia forces act on the vehicle occupants, the motor vehicle seat, and the safety belt system which secures the vehicle occupants. In addition, the abrupt deceleration exerts upward, forward and/or rearward forces on a seat height adjustment device, which is often a weak point of the seat structure. There is thus the danger that the seat height adjustment device will become deformed and/or break, and consequently that the motor vehicle seat, and with it the vehicle occupants, will be shifted upward, forward or rear ward, increasing the risk of injury, particularly to the head area.
>
> ***
>
> One object of the present invention is to provide an improved structure for a motor vehicle seat of the type described above, that provides increased occupant protection.

70. This application was filed after FCA and Lear agreed that the Seat would be designed to maintain its pre-test position in specified rear-impact sled testing, and at least 3 years ***before*** FCA sold its first Class Vehicle. As with the risks presented to an out-of-position occupant, FCA and Lear knew or should have known of the elevated risk of injury posed by the Defect.

71. Under well-established products liability law, FCA and Lear were required to warn purchasers (and foreseeable users) that (1) the Seat and Defective Seat Height Adjuster had not been adequately tested to ensure that they would perform in a reasonably safe manner in a rear-impact collision at speeds as low as 25 MPH; (2) that Lear found it necessary to strap the feet of test dummies to the floor of the sled test assembly to avoid damage to the dummies; (3) that the collapse of the Seat in a rear-impact collision would result in the occupant being out of position in relation to every other component of the safety system; (4) that the higher the Seat was adjusted, the greater the risk of injury; and (5) that other FCA vehicles were equipped with manual and distinctly different designed electric seat height adjusters and head restraints presented a significantly lower risk of injury. Each of these disclosures would have been material to a reasonable consumer, including Plaintiffs and Class Members, considering the purchase of a Class Vehicle. FCA and Lear, however, failed to provide these warnings.

**E. Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343)**

72. FCA and Lear, by and through their enterprise(s), engaged in the following acts of racketeering, as defined by 18 U.S.C. § 1961(1):

73. FCA and Lear, by and through their enterprises, engaged in a systematic and ongoing scheme with the intent to defraud, and/or deceive Plaintiffs and Class Members (collectively referred to herein as "victims"). Defendants knowingly devised and/or knowingly participated in a scheme or artifice to defraud the victims or to obtain the money or property of the

victims by means of false or fraudulent pretenses or representation in violation of 18 U.S.C. §§ 1341, 1343.

74. Defendants' business practices described above are contrary to public policy or fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society in violation of 18 U.S.C. §§ 1341, 1343. Such actions were not simply engaging in ordinary business conduct – they went much further. Specifically, FCA and Lear agreed to a course of conduct that exposes millions of Americans to a serious risk of injury or death every day.

75. Defendants could foresee that the U.S. Mail and/or interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. §§ 1341, 1343.

76. FCA and Lear acting singularly and in concert, personally and through their enterprise(s), used the U.S. Mail or interstate wires or caused the U.S. Mail or interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud the victims," within the meaning of 18 U.S.C. §§ 1341, 1343.

77. By way of example, upon information and belief, FCA and Lear used the U.S. Mail, interstate wires, and electronic communications to exchange communications between themselves and others, including but not limited to the following communications, that furthered and facilitated their scheme to defraud:

a. communications between and amongst FCA, Lear, and third parties regarding the design and manufacture of the Seat Height Adjuster;

b. communications (such as purchase agreements, financing terms, warranties, product literature) to further and facilitate the sale of the Class Vehicles;

c. owners' manuals regarding the operation of the Seat without disclosing the Defect;

d. telephone conversations and email exchanges between FCA's Customer Experience Center and any Plaintiff or other class member concerning the Defect;

e. electronic and mailed communications among or between FCA and Lear, victims, and the NHTSA regarding the Seat Height Adjuster, including those transmitted through the Vehicle Safety Hotline;

f. blogs and other websites where consumers have discussed and sought information regarding the Seat Height Adjuster.

g. certifications to the Class Members by way of the medallion affixed to the door jamb of each Class Vehicle that the Vehicle complied with all FMVSS standards;

h. Communications between Plaintiffs and other Class Members regarding the replacement of seats due to the Defective Seat Height Adjuster.

i. Examples of the FCA Enterprise's multiple predicate acts of mail and wire fraud are summarized in the below subparagraphs.[11]

   1. FCA and Lear violated the mail fraud act by affixing false and/or misleading safety certifications in each Class Vehicle and shipping them to dealers through interstate carriers.

   2. FCA and Lear also violated the mail and/or wire fraud acts by using mail and/or wire in connection with the creation of certification stickers and owners'

[11] Many of the precise dates and examples of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

manuals for Class Vehicles that contained false and/or misleading statements and assurances regarding the vehicles' Occupant Restraint Systems. Examples of such statements are located in the respective owner's manuals. Because FCA and Lear took no steps to warn consumers of the Defects, the Class Vehicles were sold to Plaintiffs and the Class under false and/or misleading pretenses insofar as the certification labels, and owner's manuals suggested that the Class Vehicles had working Occupant Restraint Systems with no known defects. Lear and Keyang were aware of FCA's standard practice of selling Class Vehicles under these false or misleading pretenses, but conspired with FCA to conceal the existence and scope of the defect in the Seats installed in Class Vehicles.

3. FCA and Lear also violated the mail and wire acts by falsely advertising the safety of FCA Class Vehicles through broadcast media, through social media, on its website, and in printed materials. FCA's advertising uniformly omitted any description of the Defect or that they were vulnerable to deformation during rear impact collisions;

78. FCA and Lear, based upon their joint relationship, violated the mail fraud act by affixing false and/or misleading safety certifications relating to each Class Vehicle and shipping them to dealers through interstate carriers. FCA and Lear also violated the mail and/or wire fraud acts by using mail and/or wire in connection with the creation of certification stickers and owners' manuals for Class Vehicles that contained false and/or misleading statements and assurances regarding the vehicles' occupant restraint systems. Examples of such statements are in the respective owner's manuals. Because FCA and Lear took no steps to warn consumers of the Defect, the Class Vehicles were sold to Plaintiffs and the Class under false and/or misleading pretenses insofar as the certification labels and owner's manuals suggested that the Class Vehicles had working occupant restraint systems with no known defects. FCA was aware that its Authorized

Dealerships were selling Class Vehicles under these false or misleading pretenses , concealing the existence and scope of the Defects.

79. Between 2010 and 2023, Lear's Engineering and Testing Department knowingly transmitted FMVSS 207 compliance data and certification materials for the Class Vehicles via interstate wire to FCA's Compliance Department, without providing testing of the Seat in the full-up position. These material transmissions, made from Lear to FCA, were material omissions intended to further the sale of Class Vehicles while concealing the Defect.

80. FCA violated the mail and wire acts by falsely advertising the safety of FCA Class Vehicles through broadcast media, through social media, on its website, and in printed materials. FCA's advertising ***never*** included a disclosure of the Defect or that Class Vehicles were vulnerable during rear impact collisions and that the occupant restraint system could fail in Class Vehicles endangering occupants.

81. FCA and Lear violated the mail and wire fraud acts by using interstate mail and wire to submit paper and electronic versions of a misleading certification reports falsely stating that the Class Vehicles equipped with the Seats were not defective because Seat's complied with FMVSS standards, even though the higher the Seat was raised, the lower the speed at which the unreasonable risk of injury increases.

82. All the wire communications described above crossed interstate and international borders by reason of the technology used to transmit the communications.

83. Upon information and belief, Lear co-authored or approved the seat-safety text included in FCA's owner's manual, transmitted to FCA by interstate wire, stating that the Seats and occupant restraint systems met applicable safety standards, without disclosing that the Seat

Height Adjuster would collapse during rear impacts. These statements and omissions were intended to be disseminated to consumers in Class Vehicles sold between 2010-2023.

84. It is not possible for Plaintiffs to plead with particularity all instances of mail or wire fraud that advanced, furthered, executed, and concealed the schemes because the particulars of many such communications are within the exclusive control and knowledge of FCA and Lear. For example, FCA used the mail and wires to, among other things, market the Class Vehicles while failing to disclose material information regarding the Defect that directly impacted occupant safety. Plaintiff reasonably believes that FCA will produce records of communications described herein with all Plaintiffs and Class Members.

85. Each and every use of the U.S. Mail and interstate wires described above was committed by FCA and Lear, jointly and separately, with the specific intent to defraud the victims or to obtain the property of the victims by means of false or fraudulent pretenses, representations, or promises. These acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

86. As set forth above, Plaintiffs and other Class Members relied on FCA and Lear's explicit or implicit fraudulent representations and/or its fraudulent omissions set forth above.

**F. Plaintiffs' and Class Members' Damages**

87. To date, Defendants have not demonstrated that they are capable of providing adequate repairs for the Defect, and Plaintiffs and Class Members do not know whether Defendants can provide such a repair. As a result, Plaintiffs, at this stage of the litigation, seek both restitution and a remedy at law, where the claims so permit.

88. Plaintiffs and Class Members purchased their Vehicles with the reasonable expectation that the Vehicles were not defective. Accordingly, Plaintiffs and Class Members are

owed damages equal to the difference in value between the price they paid, and the actual value of the Class Vehicles had the defects been disclosed.

89. In addition, Plaintiffs and Class Members have suffered out-of-pocket losses related to obtaining replacements of the Seat (where it has been replaced), diminution in value of the Vehicles, costs associated with arranging and obtaining alternative means of transportation, and any other incidental and consequential damages recoverable under the law.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

90. Defendants have a duty to disclose to Class Members the risks associated with the Defect. They did not do so and actively concealed such information. Accordingly, any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Defect misrepresentations and omissions related thereto.

91. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendants' deception with respect to the Defect.

92. As explained above in Section V, Defendants each had a duty to disclose the Seat Defect to Plaintiffs and the Class. Rather than doing so, however, Defendants concealed the Defect from Plaintiffs and the Class by:

a. advertising the safety of the Class Vehicles and/or its Seats;

b. failing to disclose the Defect to Class Members prior to the sale of each Class Vehicle;

c. failing to disclose the Defect to Class Members after their purchase of a Class Vehicle;

d. failing to disclose the Defects to Class Members in their Owner's Manual and warranty documentation;

e. dismissing observed incidents where the Seat Height Adjuster failed and permanently deformed in Class Vehicles in relatively low speed rear-impact collisions;

f. downplaying the true scope of the risks posed by the Defects by asserting that vehicle-specific design issues (such as differences about size, shape, and weight in the vehicles) were to blame, even after Defendants observed the failure of the Defective Seat Height Adjuster across a variety of different Class Vehicles with different overall design manufactured by Chrysler, Dodge, Fiat, Maserati, and Jeep; and

g. manipulating testing and test results to downplay the extreme decrease in strength of the Seat in the full up position when tested under an initial rearward static load.

93. Also as explained above in Section V, Defendants have known or had reason to know since at least 2008 that the Defects posed a significantly elevated risk of injury or death compared to other passenger vehicles sold in the U.S. Nevertheless, Defendants failed to warn Plaintiffs or the Class, initiate recalls, or offer to replace the defective Seat.

94. The existence of the Defect would have been material to a reasonable prudent person. Due to the highly technical nature of the Defect, however, Plaintiffs and Class Members were unable to independently discover the defects using reasonable diligence.

95. Prior to the retention of counsel and without third-party experts, Plaintiffs and Class Members lack the necessary expertise to analyze the Seat Height Adjuster for signs of weakness or to even identify the Class Vehicles with defective Seats.

96. Prior to discovery, Plaintiffs could not reasonably detect the latent defect in the Defective Seat Height Adjuster without specialized testing; FCA and Lear actively concealed the defect by omitting it from safety certifications, owner’s manuals, and advertising, and by submitting compliance reports that avoided adequate testing in the full-up seat position. FCA and Lear had actual knowledge of the defect, a duty to disclose, and a fixed purpose to conceal it.

97. Accordingly:

a. Defendants' fraudulent concealment tolls the statute of limitations.

b. Defendants are estopped from relying on the statute of limitations.

c. The statute of limitations is tolled by the discovery rule.

d. Plaintiffs are entitled to equitable tolling pursuant to their RICO claims.

98. Due to their exclusive and superior knowledge of the existence and extent of the defects alleged herein, Defendants are and were under a continuous duty to disclose to Plaintiffs and Class Members the true standard, quality, and grade of the Class Vehicles and to disclose the defects described herein and the corresponding safety risk. Defendants have never done so.

99. Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, and the Defect. Plaintiffs and Class Members reasonably relied on Defendants' knowing, active, and affirmative concealment.

100. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations.

## VI. CLASS ACTION ALLEGATIONS

101. Plaintiffs, individually, and on behalf of similarly situated purchasers and lessees of the Vehicles seek to certify a Nationwide Class pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3). The class is defined as:

> **Nationwide Class**: All residents of the United States or its territories who own, owned, lease, or leased a new or used Class Vehicle, excluding any person who has pursued an action for damages for personal injury, death, or property damages for one or both Defect.

102. In the alternative to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure, Rule 23(c)(5), Plaintiffs seek to represent the following Texas Class:

> **Texas Class**: All Texas residents who own, owned, lease, or leased a new or used Class Vehicle purchased or leased in Texas, excluding any person who has pursued an action for damages for personal injury, death, or property damages for one or both Defect.

103. The Nationwide Class and the Texas Class will be referred to together as the "Class." Excluded from the Class are former owners who completed their ownership without experiencing the alleged Defect. Also, excluded from these classes are Defendants, as well as Defendants' affiliates, employees, officers and directors, and the judge to whom this case is assigned. Plaintiffs reserve the right to amend the definition of the Class if discovery and/or further investigation reveal that the Class should be expanded or otherwise modified.

104. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

105. **Numerosity:** The Class Members are so numerous that joinder of all Class Members in a single proceeding would be impracticable. While the exact number and identities of individual Class Members are unknown, Plaintiffs believe, and on that basis allege, that +1 million Class Vehicles were sold or leased Nationwide.

106. **Existence/Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Such common questions of law or fact include, *inter alia*:

a. whether FCA knew or should have known of the risks posed by the Seat Height Adjuster;

b. whether Lear knew or should have known of the risks posed by the Seat Height Adjuster;

c. whether the Defective Seat Height Adjuster causes the Seat to collapse in Class Vehicles;

d. whether FCA violated RICO, 18 U.S.C. § 1962(c)-(d);

e. whether Lear violated RICO, 18 U.S.C. § 1962(c)-(d);

f. whether FCA violated the Texas DTPA;

g. whether Lear violated the Texas DTPA;

h. whether FCA had a duty to disclose the Defect to Plaintiffs and Class Members before selling the Class Vehicles.

i. whether FCA had a duty to disclose the Defect to Plaintiffs and Class Members after selling the Class Vehicles;

j. whether Lear had a duty to disclose the Defect to Plaintiffs and Class Members;

k. whether Lear violated independent duties to Plaintiffs and Class Members when it agreed to manufacture and sell the Seat to FCA;

l. whether FCA was negligent per se in failing to notify Plaintiffs and Class Members of the risks posed by the Defect;

m. whether Lear was negligent per se in failing to notify Plaintiffs and Class Members of the Defect;

n. whether the Defective Seat Height Adjuster in Class Vehicles was defectively designed and unreasonably dangerous;

o. whether FCA breached express warranties to Plaintiffs and Class Members when it designed, manufactured, and sold the Class Vehicles;

p. whether FCA breached implied warranties to Plaintiffs and Class Members when it designed, manufactured, and sold the Class Vehicles;

q. whether FCA misrepresented material facts to purchasers

and lessees regarding the safety of Class Vehicles;

r. whether FCA knowingly concealed from Plaintiffs and Class Members an unreasonable risk of injury or death due to Defect;

s. whether FCA and Lear conspired to conceal from Plaintiffs and Class Members an unreasonable risk of injury or death due to the failure of the Defective Seat Height Adjuster in Class Vehicles;

t. whether FCA's alleged omissions and misrepresentations regarding the Class Vehicles were likely to mislead a reasonable consumer;

u. whether Lear's alleged omissions and misrepresentations regarding the Class Vehicles were likely to mislead a reasonable consumer;

v. whether a reasonable consumer would consider the risks posed by the Defect to be material;

w. whether Plaintiffs and Class Members have been damaged and, if so, the extent of such damages;

x. whether Plaintiffs' and Class Members' Vehicles are/were worth less than as a result of the risks presented by the Defect; and

y. whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, restitution and injunctive relief.

107. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, are substantially overcome, in both quality and quantity, by the numerous common questions that predominate this action.

108. **Typicality:** Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, Plaintiffs and the other Class Members were uniformly injured

through the misconduct described above. As with Plaintiffs, Class Members also purchased or leased a Class Vehicle containing the Seat Height Adjuster. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and the Class, and no defense is available to Defendants that is unique to Plaintiffs.

109. The same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of the Class. Plaintiff and the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct in selling/leasing and failing to adequately remedy the Defect.

110. **Adequacy:** Plaintiffs are adequate class representatives because they will fairly represent the interests of the class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including consumer fraud and automobile defect class action cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse or antagonistic to those of the Class.

111. **Declaratory and Injunctive Relief:** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class as a whole.

112. Plaintiffs seek narrowly tailored equitable relief consisting of (a) a corrective notice program requiring FCA and Lear to notify current owners and lessees of Class Vehicles of the defect in the Seat Height Adjuster and the safety implications related thereto, and (b) a repair or retrofit program to remedy or reinforce the Defective Seat Height Adjuster to ensure compliance under foreseeable rear-impact conditions, including testing and validation in the full-up seat position. This relief addresses ongoing omissions and the continuing risk posed to Plaintiffs and

the Class.

113. **<u>Superiority</u>:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for individual Class Members to seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system should not be required to undertake such a massive and unnecessary burden.

114. Individualized litigation by over 1 million claimants would also create potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents no significant management difficulties, if any, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Moreover, a significant majority of the discovery that has been sought or will be sought has already been done by Plaintiffs' counsel in a prior wrongful death action in state court in Texas.

115. Defendants have acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

116. Upon information and belief, Class Members can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) that Defendant FCA and its dealers maintain regarding their sales and leases of Class Vehicles.

117. Unless the classes are certified, Defendants will improperly retain monies that they received from Plaintiffs and Class Members as a result of their conduct.

# VIII. CAUSES OF ACTION

## COUNT I
## Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), against FCA and Lear

118. Plaintiffs and the Class incorporate by reference paragraphs 1-117 as though fully set forth at length herein.

**A. Defendant Persons / Enterprises**

119. Plaintiffs bring this claim on behalf of the Nationwide Class against FCA and Lear.

120. FCA, Lear, Keyang and FCA's Authorized Dealers[12] (or any subset or combination of this group) constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "FCA Enterprise").

a. the members of the FCA Enterprise share the common purpose of (among others) concealing the Defect, defrauding Plaintiffs and all Class Members, and otherwise advancing the legitimate business interests of FCA and Lear.

b. the members of the FCA Enterprise are related in that they are all involved in the design, production, promotion, and/or sale of FCA vehicles.

c. the FCA Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the FCA Enterprise has operated since at least 2010 and continues to operate to this day.

121. FCA, Lear, and Keyang are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the FCA Enterprise through a pattern of racketeering activity within the

---

Such as Clay Cooley Dallas Chrysler Jeep Dodge Ram in Dallas, Texas, and Freedom Chrysler Dodge Jeep RAM by Ed Morse in Sherman, Texas.

meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of mail and wire fraud alleged in paragraphs 72-89, *supra*.

122. FCA's authorized dealers acted as FCA's agents in the sale of Class Vehicles to Plaintiffs. FCA controlled and directed the content and dissemination of sales materials, owner's manuals, warranties, and technical service bulletins presented by dealers; FCA required dealers to submit detailed repair and warranty data to FCA and to implement FCA's TSBs. Plaintiffs' purchase funds were transmitted to FCA through FCA's dealer network and financing channels, and FCA directly benefited from the sale of the vehicle to Plaintiffs at the individual authorized dealerships. FCA's misrepresentations and omissions were directed to Plaintiffs via FCA-controlled channels and caused direct injury to Plaintiffs' property through overpayment and diminution in value.

123. The purpose of the FCA Enterprise was to mislead consumers concerning the existence and scope of the Defect. By concealing and minimizing the risks posed by the Defect, FCA, Lear, and Keyang maximized their revenue by selling as many FCA vehicles with the Defect as possible and avoiding or limiting the substantial costs and reputational harms associated with breaching warranties and recalling (or having to assist with recalling) the Class Vehicles and paying the costs of remedying the Defect. In so doing, FCA, Lear, and Keyang obtained money directly or indirectly from sales or leases to Plaintiffs and the Class by means of materially false or fraudulent misrepresentations and omissions of material facts.

124. As the owners and users of the Class Vehicles, Plaintiffs and the Class are the parties most affected by the Defect. FCA, Lear, and Keyang knew that Plaintiffs and the Class would be the parties who overpaid for the Class Vehicles as the result of their concealing the

Defect and suffered the attendant harm and safety risks of driving vehicles without properly functioning Seats.

125. At all relevant times, FCA and Lear agreed to conduct and participate, directly and indirectly, in the affairs of the FCA Enterprise through a pattern of racketeering activity. For the conspiracy to succeed FCA and Lear had to commit to secrecy about the existence and scope of the Defect.

126. When forced to acknowledge serious problems with the Seats (including one or more fatal rear-end crashes), FCA and Lear agreed in furtherance of the FCA Enterprise to obscure and minimize the Defect, when they knew the Defective Seat Height Adjuster was uniquely vulnerable to failure in foreseeable low speed rear-impact collisions,

127. FCA, Lear, and Keyang each existed separately from each other at all relevant times. They each had distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

128. FCA, Lear, and Keyang also each existed separately from the FCA Enterprise insofar as:

a. FCA designed, manufactured, and sold many vehicles that did not contain the Defect;

b. Lear designed, manufactured, and sold many driver and front passenger seats that did not contain the Defect;

c. Keyang also made many other products aside from the Seat Height Adjuster.

129. FCA participated in the FCA Enterprise by:

a. ordering and purchasing the Seats from Lear;

b. installing the Seats in Class Vehicles;

c. affixing misleading certification labels assuring applicability

of and compliance with safety requirements to the Class Vehicles and shipping the Class Vehicles to dealerships throughout the United States;

d. participating in the creation of misleading advertising for the Class Vehicles that stressed the safety of Class Vehicles and omitted material facts;

e. unlawfully concealing the fact that the Class Vehicles were equipped with a Defective Seat Height Adjuster that would fail in foreseeable rear-impact collisions, elevating the risk of serious injury or death to the occupant;

f. persisting in installing the Defective Seat Height Adjuster in new Class Vehicles even after real-world collisions confirmed the Defect; and

g. collecting revenue from the sale and lease of the Class Vehicles.

130. Lear participated in the FCA Enterprise by:

a. collaborating with FCA to develop specifications for the Defective Seat Height Adjuster;

b. designing, manufacturing, and installing the Defective Seat Height Adjuster in the Seats;

c. communicating with FCA regarding the Defect;

d. providing certification labels assuring applicability of and compliance with safety requirements to the Class Vehicles.

e. unlawfully concealing that the Class Vehicles were equipped with the Defective Seat Height Adjuster, which presented an unreasonable risk of injury and death and constituted a safety-related defect;

f. unlawfully concealing information about the existence and prevalence of the Defect from the public;

g. continuing to manufacture the defective Seats; and

h. collecting revenue flowing from the sale of defective replacement Seats.

131. Keyang participated in the FCA Enterprise by:

a. designing and manufacturing the Defective Seat Height Adjuster, including the Bracket and Lead Screw.

b. consulting with Lear and FCA concerning observed evidence of breakage of the Lead Screw and deformation of the Defective Seat Height Adjuster in Class Vehicles;

c. concealing that the Class Vehicles were equipped with the Defective Seat Height Adjuster; and

d. collecting revenue from the sale of the Defective Seat Height Adjuster.

132. Without FCA, Lear, and Keyang's willing participation in the conduct above, the FCA Enterprise's scheme and common course of conduct would have been unsuccessful.

133. At all relevant times, the Enterprise alleged herein and its activities affected interstate and foreign commerce.

134. In the alternative to the enterprise alleged in paragraph 120, *supra*, FCA's Authorized Dealers (or any subset or combination of this group) constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Dealer Enterprise"):

a. The members of the Dealer Enterprise share the common purpose of (among others) concealing the Defective Seat Height Adjuster, defrauding Plaintiffs and all Class Members, and otherwise advancing the legitimate business interests of FCA and Lear.

b. The members of the Dealer Enterprise are related in that they are all involved in the promotion, sale or repair of FCA vehicles.

c. The Dealer Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Dealer Enterprise has operated since at least 2010 and continues to operate to this day.

135. FCA, Lear, and FCA's Authorized Dealers are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Dealer Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of mail and wire fraud alleged in paragraphs 84-94, *supra*.

136. In the alternative to the enterprise alleged in paragraphs 120 and 132, *supra*, FCA, Lear, GSD&M, Omni Advertising, Doner, Stagwell, and Moncur (or any subset or combination of this group) constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Promotion Enterprise"):

a. The members of the Promotion Enterprise share the common purpose of (among others) concealing the Height Adjuster Defect, defrauding Plaintiffs and all Class Members, and otherwise advancing the legitimate business interests of FCA.

b. The members of the Promotion Enterprise are related in that they are all involved in the promotion of FCA vehicles.

c. The Promotion Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Promotion Enterprise has operated since at least 2010 and continues to operate to this day.

137. FCA, Lear GSD&M, Omni Advertising, Doner, Stagwell, and Moncur are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Promotion Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of mail

and wire fraud alleged in paragraphs 84-94, *supra*.

138. At all relevant times, the enterprises alleged herein were engaged in, and their activities affected interstate commerce and foreign commerce.

**B. Pattern of Racketeering Activity**

139. All of the acts of racketeering described herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to conceal the Defect and defraud Plaintiffs and other Class Members; their common result was to conceal the Defect and defraud Plaintiffs and other Class Members; Plaintiffs and all other Class Members are the victims of Defendants' schemes to defraud; FCA and Lear, through their agents or enterprises described above, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; and the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

140. All of the acts of racketeering described herein were continuous so as to form a pattern of racketeering activity in that FCA and Lear have engaged in the predicate acts for a substantial period of time and/or FCA and Lear's acts of racketeering have become a regular way in which Defendants do business and project into the future with a threat of repetition.

141. To carry out, or attempt to carry out the scheme to defraud, FCA and Lear did knowingly conduct or participate, directly or indirectly, in the affairs of the FCA Enterprise, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

142. The FCA Enterprise, the Dealership Enterprise, and/or Promotion Enterprise used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications

in service of the scheme through virtually uniform misrepresentations, concealments, and material omissions regarding the Defect in the Class Vehicles.

143. In devising and executing the illegal scheme, FCA and Lear devised and knowingly carried out a material scheme and/or artifice to defraud or obtain money from the Plaintiffs and the Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

144. FCA and Lear knew and intended that consumers would purchase the Class Vehicles and incur costs as a result. Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that they paid money for defective Class Vehicles that never should have been introduced into the U.S. stream of commerce, and that they overpaid for vehicles with the latent Defect.

145. As described herein, FCA and Lear engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining money from Plaintiffs and Class Members. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

146. The predicate acts had the common purpose of generating significant revenue and profits for FCA and Lear from the sale and lease of the Class Vehicles, while minimizing or avoiding costs of necessary repairs, at the expense of Plaintiffs and Class Members.

147. FCA and Lear knew and they have known for years that the Defective Seat Height Adjuster in Class Vehicles were vulnerable to deformation in rear impact collisions, and FCA continued to manufacture with Lear to sell/lease, and accept payment from Plaintiffs for them anyway.

148. Plaintiffs and Class Members are "person[s] injured in his or her business or property" by reason of Defendants violation of RICO within the meaning of U.S.C. § 1964(c). Because of Defendants' pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

a. purchase or lease of defective FCA Class Vehicles;

b. overpayment at the time of purchase or lease for FCA Class vehicles with undisclosed safety defects; and

c. other, ongoing out-of-pocket and loss-of-use expenses.

149. Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**Violations of the Deceptive Trade Practices Act – Consumer Protection Act against FCA and Lear (Tex. Bus. & Com. Code §§ 17.41, et seq.)**
**(By Plaintiffs on behalf of the Nationwide Class, or alternatively, by Plaintiffs on behalf of the Texas State Class)**

150. Plaintiffs and the Class incorporate by reference paragraphs 1-117 as though fully set forth at length herein.

151. Plaintiffs and the Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million and are therefore "consumers" within the meaning of the Texas Deceptive Trade Practices Act. TEX. BUS. & COM. CODE § 17.41, *et seq.* ("DTPA"). FCA and Lear are "person(s)" within the meaning of § 17.45(3) of the DTPA and engaged in "trade" or "commerce" or "consumer transactions" within the meaning of § 17.46(a).

152. The DTPA prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" as well as an "unconscionable action or course of action," which means

an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *See* DTPA §§ 17.45(5) and 17.50(a)(3).

153. During their business, FCA and Lear knew or should have known that the Defective Seat Height Adjuster t would fail and was not suitable for its intended use. Yet FCA and Lear concealed and suppressed material facts concerning this Defect by denying and failing to disclose the existence of this Defect to Plaintiffs and the Class.

154. FCA and Lear thus violated the Texas DTPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

155. FCA and Lear engaged in misleading, false, unfair, and deceptive acts or practices that violated the Texas DTPA by failing to disclose and actively concealing the nature of the Defect.

156. FCA and Lear had a duty to disclose to Plaintiffs and the Class the nature and risks posed by the Defect because:

a. FCA and Lear were in a superior position to know the true state of facts about the Defect and associated repair costs;

b. Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the Defect, even when the Seat failed;

c. FCA and Lear knew that Plaintiffs and the Class Members could not reasonably have been expected to learn about or discover the Defect and their associated repair costs; and

d. FCA and Lear actively concealed the Defects, their causes,

and the fact that FCA and Lear ***knowingly*** elected to expose Plaintiffs and Class Members to an increased risk of injury or death posed by the Defect.

e. Lear was in a superior position to know the true facts regarding the defect in the seat height adjuster it designed, tested, and manufactured for Class Vehicles and participated in authoring and approving consumer-facing safety certifications and owner's manual text concerning seat and occupant restraint systems. By co-authoring and approving those materials and by representing compliance with FMVSS 207, Lear made partial and misleading statements that created a duty to disclose the height adjuster's collapse risk in full-up positions during rear impacts. Lear failed to disclose these material facts at the time of sale to Plaintiffs and the Class.

157. Lear engaged in consumer-facing conduct that is "connected with" Plaintiffs' transactions within the meaning of the DTPA, including co-authoring/approving owner's manual safety content, contributing safety messaging adopted in FCA's advertising campaigns disseminated to consumers prior to sale, and supplying certification labels and compliance documents intended to be affixed to Class Vehicles and presented at the point of sale. Lear's consumer-facing contributions were designed to assure safety compliance and to induce purchases of Class Vehicles and therefore are directly connected to the sale to Plaintiffs at the individual dealerships.

158. FCA and Lear's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Class, about the safety and reliability of the Class Vehicles. Indeed, Plaintiffs and Class Members relied upon, and were entitled to rely upon, the occupant restraint system in Class Vehicles to provide reasonable protections against unreasonable risks of injury or death during a rear end collision. The occupant restraint system in the Class Vehicles, however, does precisely the opposite, forcing the occupant out of position in relation to ***every*** component of the occupant safety system. FCA and Lear concealed this

information from Plaintiffs and the Class.

159. Plaintiffs and the Class suffered ascertainable loss and actual damages as a direct and proximate result of FCA and Lear's misrepresentations and concealment of and failure to disclose material information. Plaintiffs and the Class Members who purchased or leased the Class Vehicles would not have purchased or leased them at all, or would have paid significantly less for them, had FCA or Lear disclosed the Defect. Plaintiffs also suffered diminished value of their Vehicles, as well as lost or diminished use.

160. The omissions and acts of concealment by FCA and Lear pertained to information that was material to all Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

161. FCA and Lear had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Texas DTPA.

162. FCA and Lear's violations present a continuing risk to Plaintiffs, the Class, and the general public.

163. On February 10, 2026, the Alexander Plaintiffs notified FCA and Lear of its violations of the Texas DTPA, although they were not required to do so because affording FCA and Lear a reasonable opportunity to cure its violations would have been futile. FCA and Lear received the notice letter on February 17, 2026. FCA and Lear also knew about the Defect but chose to conceal them in further violation of the Texas DTPA.

164. On June 5, 2026, Plaintiffs Brenda Turner, Shawn Fischer, Troy Stone, and Shera Stone provided pre-suit notice to FCA of the breach and defects in the Seat via certified mail, receipt return requested, to its registered agent CT Corporation System. The notice described the collapse/failure mode and requested replacement of the Seat Height Adjuster for the entire Class.

FCA received this notice and had a reasonable opportunity to cure but failed to offer an effective remedy. Notwithstanding such notice, FCA has failed and refused to offer an effective remedy.

165. Pursuant to DTPA § 17.50, Plaintiffs and the Class seek an order enjoining FCA and Lear's unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

166. FCA and Lear have been provided notice of the Defect.

**COUNT III**
**Breach of the Implied Warranty against FCA (Tex. Bus. & Com. Code § 2.314)**
**(By Plaintiffs Turner, Fischer, and Stone(s) on behalf of the Nationwide Class, or alternatively, by Plaintiffs on behalf of the Texas State Class)**

167. Plaintiffs Brenda Turner, Shawn Fischer, Troy Stone, and Shera Stone and the Class incorporate by paragraphs 1-117 as though fully set forth at length herein.

168. FCA was at all relevant times a merchant with respect to the Class Vehicles, and manufactured, distributed, warranted, and sold the Class Vehicles.

169. A warranty that the Vehicles were in merchantable condition and fit for ordinary purposes for which they were sold is implied by law.

170. Plaintiffs and Class Members purchased or leased the Class Vehicles manufactured and sold by FCA in consumer transactions.

171. The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and the Defective Seat Height Adjuster was not in merchantable condition and was not fit for the ordinary purpose for which a powered seat height adjuster is used. The Vehicles left FCA's possession and control with the Defect that rendered them at all times thereafter unmerchantable, unfit for ordinary use and foreseeable misuse, unsafe, and a threat to safety.

172. FCA knew or should have known before the time of sale to Plaintiffs and the Class

that the Defective Seat Height Adjuster was unfit for ordinary use, that rendered the Class Vehicles unfit for their ordinary purposes, and that posed a serious safety threat to drivers, passengers, and everyone else sharing the road with the Class Vehicles.

173. Despite Plaintiffs' and Class Members' normal, ordinary, and intended uses, maintenance, and upkeep, the defect in the Defective Seat Height Adjuster remained latent defects, undiscoverable before their sudden failure.

174. The Defective Seat Height Adjuster and Seat in the Vehicles and the Vehicles themselves are, and at all times and were, not of fair or average quality, and would not pass without objection.

175. All conditions precedent have occurred or been performed.

176. Plaintiffs and Class Members have used their Class Vehicles in a manner consistent with the Class Vehicles' intended use and have performed each and every duty required under FCA's warranty, including presentment, except as may have been excused or prevented by the conduct of FCA or by operation of law in light of FCA's unconscionable conduct described throughout this Complaint.

177. On June 5, 2026, Plaintiffs Brenda Turner, Shawn Fischer, Troy Stone, and Shera Stone provided pre-suit notice to FCA of the breach and defects in the Seat via certified mail, receipt return requested, to its registered agent CT Corporation System. The notice described the collapse/failure mode and requested replacement of the Seat Height Adjuster for the entire Class. FCA received this notice and had a reasonable opportunity to cure but failed to offer an effective remedy. Notwithstanding such notice, FCA has failed and refused to offer an effective remedy.

178. Alternatively, to the extent direct pre-suit notice was not perfectly satisfied, such strict compliance is excused under the doctrine of futility.

179. Providing FCA with a formal opportunity to cure would be a meaningless and futile exercise because FCA has categorically and steadfastly denied the existence of the Defect.

180. Instead of acknowledging the structural failure, Defendants have actively defended the catastrophic collapse of the Defective Seat Height Adjuster as an intentional “energy management” feature.

181. Because Defendants deny the Defect exists, have failed to issue a recall, and refuse to offer an effective repair or replacement under the warranty, any further informal dispute resolution or pre-suit demand to cure would be demonstrably futile, thereby excusing any strict non-compliance with the notice requirements.

182. In addition, upon information and belief, FCA received numerous notices of the need for repair and resulting safety issues relating to the Defective Seat Height Adjuster.

183. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by FCA to disclaim or otherwise limit express warranties in a manner that would exclude or limit coverage for the Defect that were present at the time of sale and/or lease, which FCA knew or should have known about prior to offering the Class Vehicles for sale or lease, and which FCA did not disclose and did not remedy prior to (or after) sale or lease, is unconscionable, and FCA should be estopped from pursuing such defenses.

184. FCA’s warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect and have failed of their essential purpose. FCA knew or should have known when it first made these warranties and imposed their limitations that the Defect existed, and the warranties might expire before a reasonable consumer would notice or observe the Defect. FCA also failed to take necessary actions to adequately disclose or cure the

Defect after the Defect came to its attention and sat on its reasonable opportunity to cure or remedy the Defective Seat Height Adjuster, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give FCA any more time to cure the Defective Seat Height Adjuster or cure its breaches of warranty.

185. Given the conduct described above, Defendants are estopped from disclaiming liability for their actions.

186. Privity of contract is not required for consumer implied warranty claims under the relevant laws. However, Plaintiffs and Class Members had sufficient direct dealings with FCA and their agents (dealers) to establish privity of contract. FCA, on the one hand, and Plaintiff and Class Members, on the other hand, are in privity because of FCA's New-Vehicle Limited Warranty, which FCA extends to Plaintiffs and Class Members.

187. Privity is also not required in this case because Plaintiffs and Class Members are intended third-party beneficiaries of contracts between FCA and their dealers (i.e., its agents); specifically, they are the intended beneficiaries of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiffs and Class Members. Privity is also not required because Plaintiffs' and Class Members' Vehicles are inherently dangerous due to the aforementioned Defect.

188. As a result of FCA's breaches of the implied warranty of merchantability, Plaintiffs and Class Members suffered and will continue suffer out-of-pocket losses related to obtaining replacements of Seat and the Defective Seat Height Adjuster. Plaintiffs' and the Class Members' damages also include a diminution in value of the Vehicles, costs associated with arranging and obtaining alternative means of transportation, and any other incidental and consequential damages

recoverable under the law.

**COUNT IV**
**Fraud/Fraudulent Omission/Fraudulent Concealment**
**against FCA and Lear (Based on Texas law)**
**(By Plaintiffs on behalf of the Nationwide Class, or alternatively, by Plaintiffs on behalf of the Texas State Class)**

189. Plaintiffs and the Class incorporate by reference paragraphs 1-117 as though fully set forth at length herein.

190. Defendants actively, intentionally, and knowingly concealed, suppressed, and/or omitted material facts including the increased risk of injury or death posed by the Defect in rear-impacts collisions at speeds as low as 25 MPH. They did so with the intent that Plaintiffs and Class Members rely on these omissions. As a direct result of Defendants' fraudulent conduct, as alleged herein, Plaintiffs and Class Members have suffered actual damages.

191. Defendants (1) knew or should have known at the time of sale or lease and thereafter that the Class Vehicles were infirmed by the Defect alleged herein, (2) omitted material information about the safety of the Class Vehicles, and (3) actively concealed the Defect.

192. Defendants possessed superior and exclusive knowledge regarding the Defect and therefore had a duty to disclose any information relating to the safety and functionality of key safety features in the Class Vehicles that a reasonable consumer would find material to the decision whether to purchase a Class Vehicle.

193. Plaintiffs and Class Members had a reasonable expectation that the Vehicles would contain a non-defective Seat. No reasonable consumer expects a vehicle to contain a concealed defects such as the Defective Seat Height Adjuster, components of the occupant safety system that actually renders the entire system unreasonably dangerous.

194. Plaintiffs and Class Members would not have purchased or leased the Class

Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and the existence of the Defect therein and corresponding risks, or would have paid less for the Class Vehicles.

195. Defendants knew their concealment and suppression of the existence of the Defect was false and misleading and knew the effect of concealing those material facts. Defendants knew their misstatements, concealment, and suppression of the existence of the Defect would sell more Class Vehicles. Further, Defendants intended to induce Plaintiffs and Class Members into purchasing or leasing the Class Vehicles in order to decrease costs and increase profits.

196. Plaintiffs and Class Members reasonably relied upon Defendants' knowing misrepresentations, concealment, and omissions. As a direct and proximate result of Defendants' misrepresentations, omissions, and active concealment of material facts regarding the defects described herein and associated risks, Plaintiffs and Class Members have suffered actual damages in an amount to be determined at trial.

**COUNT V**
**Money Had and Received/Unjust Enrichment (in the alternative) against FCA and Lear (Based on Texas law)**
**(By Plaintiffs on behalf of the Nationwide Class, or alternatively, by Plaintiffs on behalf of the Texas State Class)**

197. Plaintiffs and the Class incorporate by reference paragraphs 1-117 as though fully set forth at length herein.

198. This claim is pleaded in the alternative to the other claims herein.

199. As a direct and proximate result of Defendants' omissions and their failure to disclose the known defects alleged herein, Defendants have profited through the sale and lease of the Class Vehicles. Although these Vehicles are purchased through FCA's dealers, the money from the Vehicle sales flows directly to Defendants.

200. As a result of their wrongful acts, concealments, and omissions of the defects set forth above, FCA charged a higher price for the Class Vehicles than the Class Vehicles' true value. And Plaintiffs and Class Members paid that higher price for their Class Vehicles.

201. Additionally, as a direct and proximate result of Defendants' failure to disclose the existence of the defects, Plaintiffs and Class Members have vehicles that will require high-cost repairs not otherwise required, thus conferring an unjust substantial benefit on Defendants.

202. Defendants have been unjustly enriched due to the known defects in the Class Vehicles through the money paid that earned interest or otherwise added to Defendants' profits when said money should have remained with Plaintiffs and Class Members.

203. As a result of the Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

204. Equity and good conscience militate against allowing Defendants to retain their ill-gotten gains and requires disgorgement and restitution of the same.

## IX. JURY DEMAND

205. Plaintiffs demand a trial by jury on all causes of action so triable.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the proposed Class, pray for judgment as follows:

a. certification of the classes under Federal Rule of Civil Procedure 23;

b. appointment of Plaintiffs as representatives of the Class and their counsel as class counsel;

c. compensatory and other damages for economic and non-economic damages;

d. an award of restitution and/or disgorgement;

e. an injunction requiring Defendants to cease and desist from engaging in the alleged wrongful conduct and to engage in a corrective advertising campaign;

f. statutory pre-judgment and post-judgment interest on any amounts;

g. payment of reasonable attorneys' fees and recoverable litigation costs and expenses as may be allowable under applicable law; and

h. such other relief as the Court may deem just and proper.

Dated: June 15, 2026.

Respectfully submitted,

By: */s/ Bruce W. Steckler*
Bruce W. Steckler
Texas State Bar No. 00785039
Austin P. Smith
Texas State Bar No. 24102506
**STECKLER WAYNE & LOVE, PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Fax: (972) 387-4041
Facsimile: (501) 286-4659
bruce@stecklerlaw.com
austin@stecklerlaw.com

Stephen F. Malouf
Texas Bar No. 12888100
**MALOUF SHULKIN LLP**
maloufs@smalouf.com
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
T: 214.969.7373
F: 214.969.7648

Michael Cole, Attorney at Law
Texas Bar No. 24103786
michael@michael.law
2600 State Street
Dallas, Texas 75204
Telephone: 972.454.0392
Facsimile: 214.447.7770

**ATTORNEYS FOR PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF THE PROPOSED CLASS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 15, 2026, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

*/s/ Austin P. Smith*
Austin P. Smith